**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MAYRA M.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 18 C 8427** |
| ) | |
| **ANDREW M. SAUL,** ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER

Plaintiff Mayra M. seeks to overturn the final decision of the Commissioner of

Social Security ("Commissioner") denying her applications for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI,

respectively, of the Social Security Act ("SSA"). (Doc. 1). The parties consented to the

jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the

case was reassigned to this Court. (Docs. 11-13). The parties filed cross-motions for

summary judgment. (Docs. 16, 18). After careful review of the record and the parties'

respective arguments, the Court concludes that the case must be remanded for further

proceedings as outlined below. The Court therefore denies the Commissioner's motion

and grants Plaintiff's request for remand.

## BACKGROUND

### I.     Procedural History

Plaintiff applied for DIB and SSI on October 21, 2015, alleging disability since

October 21, 2015 due to bulging discs, thumb injury, leg pain, vertigo, and nausea. (R.

20, 73, 83, 197, 201, 216).[1] Born in October 1975, Plaintiff was 39 years old at the time of the alleged onset date (R. 24, 197, 201, 216), which is defined as a younger individual. 20 C.F.R. § 404.1563(c).[2] Her date last insured is December 31, 2019. (R. 20, 216).

The Social Security Administration denied Plaintiff's applications initially on December 17, 2015 and on reconsideration on March 23, 2016. (R. 93, 94, 119, 120). Plaintiff then requested a hearing, which was later held before Administrative Law Judge ("ALJ") Melissa Santiago on May 9, 2017, where Plaintiff was represented by counsel. (R. 32-72, 126-27, 139-49). Both Plaintiff and Vocational Expert ("VE") Cheryl Hoiseth testified at the hearing. (R. 32-72).

The ALJ denied Plaintiff's claims in a decision dated September 28, 2017. (R. 18-26). The ALJ found that Plaintiff's vertigo and cervical spine disc bulging with cervical radiculopathy are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20-21). The ALJ concluded that Plaintiff was not disabled from her October 21, 2015 alleged onset date through the date of the decision because she retains the residual functional capacity ("RFC") to perform light work with certain postural, manipulative, and environmental limitations, as described to the VE, and is capable of performing jobs that exist in significant numbers in the national economy. (R. 19, 21, 25-26, 63-64).

---

[1]    Citations to the Certified Copy of the Administrative Record filed by the Commissioner (Doc. 14) are indicated herein as "R." While the applications included in the record are dated November 3, 2015 (R. 197, 201), the determinations at all levels of review alternately state that the applications were filed on October 21, 2015 or November 3, 2015 (R. 18, 93, 94, 119, 120). Consistent with Plaintiff's statement that she filed on October 21, 2015 (Doc. 17, at 1), the ALJ's decision uses that date (R. 18). The Commissioner's brief is silent on this point.

[2]    Because the regulations governing DIB and SSI are substantially identical, for convenience, only the DIB regulations are cited herein.

The Appeals Council denied Plaintiff's request for review on November 1, 2018 (R. 1-6), rendering the ALJ's September 2017 decision the final decision of the Commissioner reviewable by this Court. *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). Plaintiff commenced this action on December 21, 2018 and now seeks reversal or remand, arguing that the ALJ erred in (1) evaluating the treating source opinions and (2) assessing Plaintiff's subjective symptom allegations. As explained below, the Court concludes that remand is required for the ALJ to reevaluate the opinion evidence and reassess Plaintiff's subjective statements.

## II.    Work and Medical History

Plaintiff completed three years of high school. (R. 57). She has three children: a 22 year-old daughter, 15 year-old son, and 13 year-old daughter. (R. 48-49). She lives with her two youngest children. (*Id.*). Plaintiff worked as a credit clerk and, most recently, an office messenger (R. 24, 40, 42-44, 62-63, 232), but she stopped working in October 2015 because of pain in her right arm (R. 40, 44-45).[3]

Plaintiff received treatment for seven months before the October 21, 2015 alleged onset date. In late March 2015, Plaintiff went to the emergency room, complaining of right-sided neck pain radiating to her right arm, and she was diagnosed with trapezius muscle spasm and prescribed medication. (R. 354, 356-57). At another emergency room visit in early April 2015, she reported a headache and photosensitivity. (R. 364, 368). In late June 2015, Plaintiff went to the emergency room, complaining of neck pain radiating down her back. (R. 374). She exhibited tenderness to palpation and palpable muscle

---

[3]    Plaintiff also alleged disability due in part to a left thumb injury (R. 23, 73, 83), and the records reflect some treatment for this. (R. 331, 338, 341, 379-90). Because Plaintiff's arguments do not focus on that impairment, the Court does not consider it.

spasm, and she was diagnosed with trapezius muscle strain and prescribed medication. (R. 374-76, 449).

In early July 2015, Plaintiff went to the emergency room, complaining of right-sided neck and shoulder pain and weakness/tingling radiating down her right arm. (R. 312). A nurse noted that she "[a]ppear[ed] uncomfortable, tearful." (R. 315). A physical examination showed no significant weakness or sensory or neurological deficits, and the doctor attributed mild reduction in strength to pain. (R. 313). She was diagnosed with trapezius muscle spasm and prescribed medication. (R. 320-21). Throughout the rest of July 2015, Plaintiff saw internist Eric Mizuno, M.D., complaining of pain and initially dizziness, and was diagnosed with back and muscle spasms. (R. 334-36, 455).[4] She reported improvement with medication, but could not tolerate physical therapy. (R. 334).

On August 1, 2015, an x-ray of Plaintiff's cervical spine was unremarkable, and an x-ray of her right shoulder revealed "[n]o significant osseous abnormality[.]" (R. 325-26). Plaintiff saw Dr. Mizuno later in August 2015 for muscle spasms in her right shoulder. (R. 333). He diagnosed Plaintiff with cervical radiculopathy, made a "pain referral[,]" and prescribed medication. (R. 333, 455).[5] A September 19, 2015 MRI of Plaintiff's cervical spine revealed "diffuse disc bulging and spurring with large superimposed right posterior lateral disc herniation" at C6-C7. (R. 345). The next week, Dr. Mizuno diagnosed Plaintiff with persistent muscle spasms and prescribed medication. (R. 332). On October 20,

---

[4]     The July 20, 2015 treatment note was signed by the nurse practitioner. (R. 335, 455).

[5]     Plaintiff states that Dr. Mizuno noted positive Spurling in August 2015, but acknowledges that the handwritten notes are at times illegible. (Doc. 17, at 3 n.1). The note is difficult to read, but appears to say that. (R. 333). The Commissioner does not dispute Plaintiff's reading. The Spurling test checks for radiculopathy. *See Jayne v. Berryhill*, No. 18-cv-3159, 2019 WL 3400624, at *5, n.1 (C.D. Ill. July 26, 2019) (citing Dorland's Illustrated Medical Dictionary (32nd ed. 2012), at 1900)).

2015, Dr. Mizuno again diagnosed Plaintiff with persistent muscle spasms and cervical radiculopathy and prescribed medication. (R. 331). The next day, Plaintiff applied for DIB and SSI. (R. 18, 93, 94, 119, 120).

On October 24, 2015, Plaintiff went to the emergency room, complaining of dizziness, lightheadedness, blurred vision, and nausea, but left without being seen. (R. 395-96). Three days later, Plaintiff saw Dr. Mizuno for help completing disability paperwork and reported her recent visit to the emergency room. (R. 330). At that appointment, Dr. Mizuno diagnosed Plaintiff with vertigo. (*Id.*). On November 2, 2015, Roberto Levi, M.D. noted that Plaintiff had vertigo for about a week, and he recommended that she not drive and be accompanied when she went out. (R. 341). The next day, Plaintiff complained to Dr. Mizuno of vertigo going on two weeks, and he diagnosed "migrainous vertigo[.]" (R. 329).

On November 4, 2015, Gita Rupani, M.D. examined Plaintiff. (R. 338-39).[6] She was not in significant distress, rated her current neck pain as 5/10, and described pain radiating down her arm and numbness in her fingers with average pain rated as 9/10. (R. 339). She did not have an antalgic gate. (*Id.*). Examination of Plaintiff's head and neck was "significantly painful[,]" she exhibited tenderness, Spurling was positive on the right, pain affected her right shoulder range of motion, and sensation was subjectively diminished in all fingers. (*Id.*). Her upper extremity strength was adequate, but there was "limited effort in trying to do muscle testing." (*Id.*). Dr. Rupani administered trigger point injections, after which Plaintiff "felt significant relief in her right shoulder[,]" and prescribed

---

[6] Dr. Rupani's evaluation states that a physician in Dr. Mizuno's practice had referred Plaintiff for assessment. (R.337-38, 455).

a cervical epidural steroid injection. (*Id.*). Two weeks later, Dr. Rupani noted positive Spurling on the right and diagnosed Plaintiff with cervical radiculitis. (R. 410). On December 4, 2015, Dr. Rupani performed a cervical epidural steroid injection at C6-C7, noting that Plaintiff was "aware that the injection may not help significantly due to the disc herniation." (R. 411-13). That day, Plaintiff reported "significant pain relief." (R. 413).

Plaintiff saw Dr. Mizuno throughout 2016, and he continued to diagnose muscle spasms, herniated disc, and cervical radiculopathy and to prescribe medication. (R. 417, 444, 496-505). In January 2016, Plaintiff complained of vertigo, dizziness, and pain. (R. 417).[7] On the same day as that visit, Dr. Mizuno completed a physical residual functional capacity questionnaire. (R. 440-42). Dr. Mizuno stated that Plaintiff had severe cervical radiculopathy, for which she pursued epidural steroid injection and medication was not helpful, and he described her prognosis as fair. (R. 440). He also stated that she had right hand tingling and numbness and severe neck and arm pain. (R. 441-42). Dr. Mizuno opined that Plaintiff was limited in how long she could continuously stand and sit and alternately sit or stand; needed to lay down during the day; could walk two blocks without stopping; could lift and carry five to ten pounds; and could travel alone. (*Id.*). The extent of the limitation on standing, sitting, and alternating between sitting and standing is unclear because Dr. Mizuno wrote either "1-20" or "1-2°" without including the word minutes or hours. (R. 441). Plaintiff read the limitation as "1-20," meaning minutes, but the ALJ interpreted it as "1-2°," using the symbol "°" to denote hours. (R. 23-24, 38-39, 441).

---

[7]     Plaintiff states that, in January 2016, Dr. Mizuno noted positive right-sided Spurling. (Doc. 17, at 5). The handwriting and abbreviations are difficult to decipher (R. 417), but the Commissioner does not dispute Plaintiff's characterization.

In February 2016, Plaintiff saw Dr. Mizuno and reported right side tingling and numbness. (R. 444). In April 2016, she complained of leg pain exacerbated by walking and prolonged standing. (R. 505). In June 2016, Dr. Mizuno referred Plaintiff for physical therapy. (R. 503). She attended numerous physical therapy sessions from June through August 2016 and, in July 2016, reported that it was "working very well[.]" (R. 485-95, 501, 503).[8] In August and September 2016, Plaintiff had no new complaints. (R. 500, 502). In early October 2016, Plaintiff complained of migraines going on two weeks, especially in the morning, and lasting one to two hours. (R. 499). At that visit, Dr. Mizuno diagnosed Plaintiff with migraine headaches related to cervicalgia. (*Id.*). Later in October 2016, Plaintiff reported dizziness going on three days, and Dr. Mizuno diagnosed vertigo. (R. 498). A November 21, 2016 MRI of Plaintiff's brain and internal auditory canals was normal. (R. 459-61).

Plaintiff also saw Dr. Mizuno in January and mid-March 2017, and he continued to diagnose muscle spasms and herniated disc and to prescribe medication. (R. 496-97).[9] In late March 2017, James Diesfeld, M.D. saw Plaintiff for pain management on referral from the nurse practitioner in Dr. Mizuno's practice. (R. 510-12). Dr. Diesfeld noted that Plaintiff had received a cervical epidural steroid injection that provided around five days of pain relief and multiple trigger point injections, and she had physical therapy a year

---

[8]     Plaintiff states that, in June 2016, she reported "five days of relief from her last steroid shot and asked to try physical therapy." (Doc. 17, at 5). The note is very difficult to read, but the Court can see " . . . had a steroid . . . works for 5 days . . . " (R. 503) so Plaintiff's reading may be accurate. Again, the Commissioner does not challenge that interpretation. It is not clear whether the note refers to the December 2015 cervical epidural steroid injection (R. 411-13), but the record includes no documentation of another such injection.

[9]     The March 2017 treatment note included the nurse practitioner's initials. (R. 455, 496).

ago that was "helpful at the time." (R. 510).[10] Examination revealed normal gait, intact sensation, tenderness to palpation, decreased right side range of motion, muscle strength of 4/5 with effort, and some guarding on the right side due to pain. (*Id.*). Dr. Diesfeld's impression was possible cervical degenerative disc disease with secondary myofascial trigger points/spasm and non-specific right arm paresthesias. (*Id.*). He administered TENS therapy, from which Plaintiff "had good relief." (*Id.*).[11] He recommended continuing TENS therapy at home "to treat chronic refractory pain, unresponsive to 3 or more months of medical therapy[,]" using a cervical collar and heating pad, obtaining an MRI, scheduling manual therapy, and following up in six weeks; he also prescribed medication. (R. 510-11). The record includes four appointment reminders dated April 2017 and May 2017, including for therapy and "one day surgery[,]" but no accompanying treatment notes. (R. 513).

At the May 9, 2017 administrative hearing, the ALJ requested that Plaintiff contact Dr. Mizuno to clarify his opinion on her need to lay down and to provide an update if his opinion had changed. (R. 39). On May 30, 2017, Dr. Mizuno completed an updated residual functional capacity questionnaire. (R. 514-16). Dr. Mizuno confirmed that Plaintiff still suffered from cervical radiculopathy with severe neck and arm pain and stated that her condition had not changed. (R. 514, 516). He also stated that she received physiotherapy and cervical epidural injection with no improvement. (R. 514). Dr. Mizuno

---

[10] Dr. Diesfeld wrote that Plaintiff had received care around a year ago from pain specialist Dr. Mizuno. (R. 510). The reference to Dr. Mizuno appears to be a mistake, as Dr. Mizuno is an internist (R. 455), and the care described (injections) is consistent with that of Dr. Rupani (R. 339, 411-13).

[11] "TENS stands for 'transcutaneous electrical nerve stimulation.'" *Bates v. Colvin*, 736 F.3d 1093, 1096 n.2 (7th Cir. 2013). A TENS unit provides nerve stimulation intended to reduce pain. *Id.*

opined that Plaintiff could continuously stand and sit for 30 minutes and alternate between sitting and standing for an unspecified number of hours; needed to lay down during the day because of pain and dizziness; could walk two blocks without stopping; could lift or carry less than five pounds; and had problems grasping, pulling, pushing, or doing fine manipulations with her right hand due to tingling and numbness. (R. 514-15).

## III.    State Agency Reviewing Physician Opinions

On December 15, 2015, Phillip Galle, M.D. opined that Plaintiff could occasionally lift and carry 20 pounds; could frequently lift and carry ten pounds; could stand, walk, and sit more than six hours on a sustained basis in an eight-hour workday; could occasionally climb ladders, ropes, and scaffolds; was limited in right overhead reaching; and needed to avoid concentrated exposure to hazards (machinery, heights, etc.). (R. 77-80, 87-90). On March 21, 2016, Young-Ja Kim, M.D. rendered the same opinion. (R. 101-03).

## IV.    Administrative Hearing

On May 9, 2017, Plaintiff appeared with counsel at a hearing before ALJ Santiago. (R. 32.) Plaintiff testified that, for her neck, she wore a brace when the pain was very severe, which was daily. (R. 46-48). The neck brace was uncomfortable and did not relieve the pain. (R. 47). She also got injections and took medication. (R. 48). Plaintiff felt pain in her cervical spine and down her dominant right arm as well as daily intermittent numbness and tingling in her right arm. (R. 50-51). Some days the pain was better, but still present. (*Id.*). Plaintiff had vertigo every morning for about two hours. (R. 46). She got migraine headaches about every other day. (R. 52-53). Medication helped the pain, but not the vertigo or migraine headaches. (R. 46, 51-53). Medication also made her

drowsy and sometimes dizzy, and she could not go out by herself when she took it. (R. 54-55).

Plaintiff lived in a second floor apartment, but had requested to move to the first floor because of the stairs. (R. 48-49). She took a train to get to the hearing, and a friend accompanied her. (R. 49, 54). She could drive, but did not because of her medication. (R. 49). Her sister took her where she needed to go, such as the grocery store or doctor's office. (*Id.*). Her children did the housework and laundry, and they helped her get dressed. (R. 50). She could prepare light meals. (R. 53). She could not carry grocery bags or pour from a full gallon of milk and would not lift anything due to pain and because she did not want to "mess[] [her]self up even more[,]" but she could grab light items at waist level. (R. 53, 56-57). On an average day, Plaintiff would sit for a little bit and then lay back down. (R. 53). She spent most of the day laying in bed, which was the most comfortable position. (*Id.*). She alternated standing and sitting during the hearing because she was in pain, and switching positions helped. (R. 55-56). She could sit for about 20 to 30 minutes before she needed to stand. (R. 56).

In response to questions from the ALJ, the VE testified about the ability of a person of Plaintiff's age, education, work experience, and skill set who could perform a range of light work; never climb ladders, ropes, or scaffolds; occasionally crawl; never work around unprotected heights, open flames, and dangerous and/or moving machinery; and occasionally reach overhead with the right upper extremity. (R. 63-64). According to the VE, such a person could not perform Plaintiff's past work (Office Messenger and Credit Clerk). (R. 62-64). Such a person could perform other jobs that existed in significant numbers in the national economy, such as Usher and Counter Clerk. (R. 64).

<u>**DISCUSSION**</u>

**I.    Governing Standards**

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the SSA. In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the applicable regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'"  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'"  *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)).  Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."

*Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

### B. Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## II. Analysis

### A. Opinion Evidence

Plaintiff challenges the ALJ's evaluation of the treating source opinions. (Doc. 17, at 10-13; Doc. 20, at 1-5). A treating source opinion is entitled to controlling weight if it is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (noting that this rule governs claims filed before March 27, 2017, *see* 20 C.F.R. § 404.1520c(a) (2017)). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it as long as she provides an adequate explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). That is to say, the ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011), and then determine what weight to give it considering "'the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.'" *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (quoting *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2008)); 20 C.F.R. § 404.1527(c)(2)-(6).

The ALJ gave Dr. Mizuno's January 2016 and May 2017 opinions "only limited weight" because "there is no support in the evidence for the severity of limitation." (R. 23). In support of that conclusion, the ALJ explained that Dr. Mizuno's statement that Plaintiff had not responded to treatment was inconsistent with treatment records showing that Plaintiff got relief from injections and physical therapy. (R. 23-24, 514). That explanation, however, ignores contrary evidence.

While it is true that, on December 4, 2015, Plaintiff reported significant pain relief from a cervical epidural steroid injection administered by Dr. Rupani, the ALJ failed to acknowledge that the improvement was reported only on the day of the procedure. (R.

23, citing R. 413).   Indeed, Plaintiff told Dr. Diesfeld in March 2017 that the cervical epidural steroid injection had provided just five days of pain relief.  (R. 510).   The ALJ ignored that aspect of Dr. Diesfeld's report. (R. 23, citing R. 510-11).  The ALJ additionally overlooked Dr. Rupani's contemporaneous note on the day of the procedure that the epidural steroid injection might "not help significantly due to the disc herniation."  (R. 412). The ALJ cannot simply ignore evidence that, consistent with Dr. Rupani's warning, Plaintiff got only temporary relief from the epidural steroid injection. *See Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("the ALJ . . . may not dismiss a line of evidence contrary to the ruling.").

In addition, the ALJ's statement that Plaintiff got relief from physical therapy (R. 24), although accurate, is incomplete.   Plaintiff received physical therapy from June through August 2016 and, indeed, reported that it helped at that time.  (R. 485-95, 501, 503, 510).  As an initial matter, mere improvement does not necessarily mean that Plaintiff was not disabled. *See Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("[t]he key is not whether one has improved (although that is important), but whether [she] has improved enough to meet the legal criteria of not being classified as disabled."). Moreover, Plaintiff's treatment did not stop with physical therapy.  For the rest of 2016 and beginning of 2017, Plaintiff continued to treat with Dr. Mizuno, who consistently diagnosed muscle spasms, herniated disc, and cervical radiculopathy and prescribed medication, and, in 2017, Plaintiff was referred to Dr. Diesfeld for pain management.  (R. 496-500, 502).   The ALJ noted that Plaintiff obtained relief from TENS therapy administered by Dr. Diesfeld (R. 23, 510), but failed to mention that Dr. Diesfeld also prescribed further treatment of TENS therapy for "chronic" pain as well as a cervical collar,

a heating pad, manual therapy, and medication.  (R. 510-11).  The ALJ did not discuss any of Plaintiff's ongoing treatment or explain why she found such treatment incompatible with persistent physical limitations.  *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

In discounting Dr. Mizuno's opinions, the ALJ also emphasized Plaintiff's normal gait and intact sensation upon examination by Dr. Diesfeld in March 2017.  (R. 24, citing R. 510).  While the ALJ noted Plaintiff's decreased cervical range of motion, tenderness to palpation, and muscle strength of 4/5 at that same examination (R. 23, citing R. 510), she failed to explain any basis for treating those findings as less significant than the observations of normal gait and intact sensation.[12]  The ALJ additionally ignored Dr. Diesfeld's observation of some guarding on Plaintiff's right side due to pain.  (R. 510). Also missing from the ALJ's decision is any discussion of Dr. Rupani's observations on November 4, 2015 that Plaintiff's head and neck were significantly painful upon examination, she exhibited tenderness, Spurling test was positive on the right, and pain affected her right shoulder range of motion.  (R. 23, 339).  The ALJ's selective omission of findings evincing Plaintiff's physical limitations and pain constitutes impermissible cherry-picking of the evidence.  *See Gerstner*, 879 F.3d at 262 ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability

---

[12]     The ALJ initially treated Dr. Diesfeld's note of muscle strength of 4/5 as a normal finding (R. 23, 510), but subsequently stated that Plaintiff's strength was "minimally decreased" (R. 24).

while ignoring other portions that suggest a disability.") (quoting *Campbell*, 627 F.3d at 301); *Denton*, 596 F.3d at 425.

Finally, the ALJ found "no indication" that Plaintiff could not lay down (as Dr. Mizuno opined that she would need to) during breaks (R. 24), which ignored evidence that laying down during breaks could present a problem. Specifically, the VE testified that "[a] lot of people" lay down during break time in their cars, but would not necessarily be able to do so at a worksite. (R. 70). The ALJ did not acknowledge that qualification of the VE's testimony or address how it could impact Plaintiff, who testified that she did not drive a car and spent most of the day laying down. (R. 22, 24, 49, 53). In that way, too, the ALJ failed to deal with evidence that does not support her conclusion. *See Villano*, 556 F.3d at 563.

Rather than focus on Dr. Mizuno's opinions, the Commissioner argues that the ALJ properly found the state agency reviewing physicians' opinions more persuasive than those of the treating physician. (Doc. 19, at 3, 5-6). The ALJ gave the opinions of state agency reviewing physicians Drs. Galle and Kim "great weight." (R. 24). Both opined that Plaintiff could occasionally lift and carry 20 pounds; could frequently lift and carry ten pounds; could stand, walk, and sit more than six hours on a sustained basis in an eight-hour workday; could occasionally climb ladders, ropes, and scaffolds; was limited in right overhead reaching; and needed to avoid concentrated exposure to hazards (machinery, heights, etc.). (R. 77-80, 87-90, 101-03).

Dr. Galle's opinion is dated December 15, 5015, and Dr. Kim's opinion is dated March 21, 2016. (R. 80, 90, 103). The ALJ omitted those dates from the decision and did not address the timeliness of the opinions. (R. 24). The Commissioner contends that

Drs. Galle and Kim "reviewed the entire record including plaintiff's improvement with treatment[.]" (Doc. 19, at 5). The Court finds that assertion incorrect.

Given that the record reflects Plaintiff's treatment through March 2017, the dates alone suggest that the state agency reviewing physicians' opinions in 2015 and 2016 were not based on review of the entire record. It is clear from the opinions that the most recent evidence on which Dr. Galle relied was Dr. Rupani's November 4, 2015 examination (R. 79, 89, 339), and the most recent evidence on which Dr. Kim relied was Dr. Mizuno's February 2016 treatment note (but not his January 2016 opinion) (R. 103, 444). As such, Dr. Galle did not consider the cervical epidural steroid injection in December 2015, Dr. Mizuno's January 2016 opinion, Plaintiff's consistent treatment with Dr. Mizuno throughout 2016 and early 2017, her physical therapy in mid-2016, her visit to Dr. Diesfeld for pain management in March 2017, and Dr. Mizuno's May 2017 opinion. Dr. Kim likewise did not consider Plaintiff's treatment throughout 2016 and into 2017 and Dr. Mizuno's opinions. The ALJ cannot rely on such outdated reviewing physician opinions under these circumstances. *See Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (ALJ relied on outdated reviewing consultants' opinions rendered before pain specialist treated plaintiff, treating physician performed surgery and opined that plaintiff had increased pain and diminished functioning, and physical therapist found plaintiff's functional abilities diminished); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (". . . . ALJ erred by continuing to rely on an outdated assessment by a non-examining physician . . . "); *Campbell*, 627 F.3d at 309 (finding that ALJ did not adequately explain why reviewers' opinions were entitled to greater weight than that of treater where they did not have the benefit of reviewing treater's records).

Along with the ALJ's insufficient analysis of the treating physician's and state agency reviewing physicians' opinions discussed above, the Court notes that the ALJ also did not adequately address the regulatory factors in weighing Dr. Mizuno's opinions. *See* SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996) (treating source opinions "are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527"); *Lambert*, 896 F.3d at 775 ("ALJs must evaluate a treating physician's noncontrolling opinion by considering the treating relationship's length, nature, and extent; the opinion's supporting explanation and consistency with other evidence; and any specialty of the physician."); *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013) (ALJ must "sufficiently account[] for the factors in 20 C.F.R. § 404.1527"); *Campbell*, 627 F.3d at 308 (remanding where the ALJ did "not explicitly address the checklist of factors" listed in 20 C.F.R. § 404.1527 as applied to the medical opinion evidence).[13]

For all of the foregoing reasons, the case is remanded for further proceedings consistent with this opinion to reevaluate the opinion evidence.

### B.    Subjective Statements

Plaintiff also challenges the ALJ's assessment of her subjective symptom allegations. (Doc. 17, at 13-15; Doc. 20, at 6-8). The regulations describe a two-step process for evaluating a claimant's own description of her impairments. SSR 16-3p, 2017 WL 5180304, at *2. First, the ALJ "must consider whether there is an underlying medically

---

[13]    The Social Security Administration rescinded SSR 96-2p in connection with its new rules governing the analysis of treating physician opinions, but that rescission is effective only for claims filed on or after March 27, 2017. *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 2017 WL 3928298, at *1 (Mar. 27, 2017).

determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." *Id.* at *3. Second, if there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . . " *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations . . . and justify the finding with specific reasons." *Villano*, 556 F.3d at 562.

The Court gives the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted). A reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). The claimant bears the burden of showing that an ALJ's subjective symptom evaluation is patently wrong. *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018).

In finding Plaintiff's testimony not entirely credible, the ALJ relied on Plaintiff's presentation at the hearing. (R. 22). The ALJ stated that Plaintiff appeared comfortable and sat through the entire hearing (R. 22), but ignored Plaintiff's testimony that she actually had to alternate standing and sitting during the hearing because she was in pain. (R. 55-56). The ALJ also stated that Plaintiff displayed adequate memory in answering questions (R. 22), but failed to mention Plaintiff's inability to remember one of her job titles (R. 22, 43-44, 59, 62-63). The Commissioner challenges the relevance of Plaintiff's

memory failure because she did not allege mental impairment. (Doc. 19, at 9). But that assertion misses the point that the ALJ made inaccurate statements about Plaintiff's presentation at the hearing with respect to memory and failed to address contrary evidence.

The ALJ also considered Plaintiff's activities of daily living, but without accounting for her limitations in performing those activities. (R. 22, 24). It is appropriate for an ALJ to consider a claimant's daily activities when evaluating credibility if it is done "with care" because "a person's ability to perform daily activities, especially if th[ey] can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). This means that "[a]n ALJ cannot disregard a claimant's limitations in performing household activities." *Moss v. Astrue*, 555 F.3d 556, 563 (7th Cir. 2009); *see Pratt v. Colvin*, No. 12 C 8983, 2014 WL 1612857, at *8-9 (N.D. Ill. Apr. 16, 2014) (ALJ erred in failing to disclose or account for plaintiff's limitations in performing household activities and did not explain how those minimal activities contradicted claimed pain and limitations).

Here, the ALJ overlooked evidence qualifying Plaintiff's ability to perform activities of daily living. While the ALJ correctly stated that Plaintiff lived in a second floor apartment (R. 22), the ALJ ignored Plaintiff's testimony that she requested to move to the first floor because of the stairs (R. 49). Although the ALJ accurately noted that Plaintiff used public transportation and shopped in stores (R. 22), the ALJ did not acknowledge that typically Plaintiff's sister took her where she needed to go, for example to the store to buy groceries and household items and to the doctor, and she did not go out by herself (R. 49, 54-55, 247). The ALJ also declined to mention other activities in which Plaintiff was limited,

namely that Plaintiff's children did the housework and laundry and helped her get dressed. (R. 50). In addition to ignoring that conflicting evidence, the ALJ incorrectly cited a handwritten function report as evidence of Plaintiff's ability to write legibly and neatly (R. 22), but failed to recognize that the form conveyed nothing about Plaintiff's functioning because Plaintiff did not complete it (her sister did) (R. 49, 251).

For all of the foregoing reasons, this case is remanded for further proceedings consistent with this opinion to reassess Plaintiff's subjective statements about her physical limitations.

## CONCLUSION

For the reasons stated above, Plaintiff's request for remand (Doc. 16) is granted as outlined above, and the Commissioner's Motion for Summary Judgment (Doc. 18) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Social Security Administration for further proceedings consistent with this Order.

ENTER:

Dated: December 10, 2019

SHEILA FINNEGAN
United States Magistrate Judge